\*FRAZIER *v.* RAILWAY COMPANY.

(*Knoxville.* October 26, 1889.)

1. RAILWAY COMPANIES. *Power to consolidate or mortgage property.*

Railway corporations cannot, without legislative permission, consolidate with each other, or sell, lease, or mortgage their property; and therefore the Legislature may couple with the grant of those powers such conditions and limitations as it chooses to impose.

Cases cited and approved: Mallory *v.* Oil Works, 86 Tenn., 603; Thomas *v.* Railroad, 101 U. S., 71.

2. SAME. *Limitation of Act of 1877 upon power of consolidated roads to make mortgages, valid.*

That is a valid and constitutional limitation upon the power of consolidated railway companies to make mortgages imposed by third *proviso* of the third section of the Act of 1877, amendatory of "the law in relation to the consolidation of railways," which inhibits any railway corporation thereafter "to give or create any mortgage or other kind of lien on its railway property in this State, which shall be valid and binding against judgments and decrees and executions therefrom for timber furnished and work and labor done on, or for damages done to persons and property in the operation of its railroad in this State."

Acts construed: Acts 1877, Ch. 72, § 3, proviso 3.

(See kindred Acts: Acts 1877, Ch. 12, § 3, and Acts 1873, Ch. 8, § 5.)

3. SAME. *Same.* *Claim for " damages done to persons."*

Claim has priority under said *proviso* as " damages done to persons," when due upon breach of a contract whereby the railway company agreed to pay a person injured by its negligence $1,800 cash and $90 per month for five years, in consideration of his release of all claim

---

\*Taken by writ of error to Supreme Court of the United States upon the question as to construction of the original charter of the East Tennessee and Virginia Railway Company.—REPORTER.

Frazier *v.* Railway Company.

for damages, the injured person agreeing to perform, during that period, such labor in the company's shops as he was able to do and called upon to perform.

Act construed: Acts 1877, Ch. 72, § 3.

4. SAME. *Same. Same. No set-off allowed company for value of injured person's services.*

Set-off will not be allowed the railway company, in such case, for value of services performed by the injured person in the prosecution of his private affairs, where it appears he was not able to work in the company's shops, and was not called upon to do so.

5. SAME. *Same. Property liable for preferred claims. Creditors' Bill.*

The *property* of a consolidated railway company in the hands of the purchaser, other than an innocent one, is liable to the claims given priority by said *proviso* of the Act of 1877, where it was sold upon foreclosure of a mortgage made by such company subject to the provisions of said Act; and it may be subjected to such claims by Creditors' Bill filed by one, on behalf of himself and all other creditors of the preferred class, against the insolvent company and the purchaser of its mortgaged property.

Code cited: §§ 1492–1496, 3431, 4294, 4295 (T. & S.); §§ 1719–1723, 4168, 5037, 5038 (M. & V.).

6. SAME. *Mortgagee cannot become innocent purchaser.*

Mortgagee of railway property purchasing at his own foreclosure sale, made under a mortgage executed subject to the provisions of said Act of 1877, in a proceeding to which the claimants given priority by that Act were not parties, is not protected, as an innocent purchaser, against such preferred claims.

7. SAME. *Charter authority to issue bonds and mortgage property.*

Provision in charter of a railway company allowing it to "increase its capital to a sum sufficient to complete its road, and to stock it with every thing necessary to give it full operation and effect, either by opening books for new stock, or by selling new stock, or by borrowing money on the credit of the company, and on the mortgage of its charter and works," gives only the limited power to the company to issue bonds and mortgage its property to *complete* and *equip* its road, and for no other purpose.

Act construed: Acts 1847–8, page 195.

8. SAME. *Same.* *Mortgage subject to limitations of the general law, when.*

Mortgage executed by such company upon its property, to secure bonds issued twenty-five years after completion of its road, will not be referred to the power granted in its charter, in the absence of allegation and proof that the bonds were issued for the purposes authorized by the charter, or in renewal of such; but, if made after the passage of the Act of 1877, and falling within its provisions, it will be subjected to the limitations imposed by that Act upon the power of consolidated railway companies to make mortgages.

9. SAME. *Power to make mortgages.* *Act of 1881 does not repeal limitations contained in Act of 1877.*

The Act of 1881, conferring the power to make mortgages upon all railway companies, in very broad terms, does not repeal the special limitations imposed by the Act of 1877 upon the power of consolidated railway companies to make mortgages of their property.

Acts construed: Acts 1877, Ch. 72, ₹ 3, proviso 3; Acts 1881, Ch. 9, ₹ 1.

10. SAME. *Judicial notice of charter.*

Judicial notice is taken of a railway charter granted by special Act of the Legislature, published as a public Act, and referred to in other public Acts subsequently passed.

Cases cited and approved: 55 Ala., 413; 58 N. H., 93.

11. STATUTES. *Repeal by implication.* *Rule.*

Repeals of statutes by implication are not favored. The repugnancy between the two statutes must be plain and unavoidable before one will be held to have repealed the other by implication.

Cases cited and approved: Hockaday *v.* Wilson, 1 Head, 114; Buchanan *v.* Robinson, 3 Bax., 152; Insurance Company *v.* Taxing District, 4 Lea, 644. (Also 13 Lea, 672).

12. CONSTITUTIONAL LAW. *Title and subject of Act.* *General rules.*

The generality of the title of an Act does not render it obnoxious to constitutional objection, so long as it is not made to cover legislation incongruous in itself, and which by no fair intendment can be considered as having a necessary or proper connection. Within these limitations, the Legislature must determine for itself what particularity shall be employed in the titles of Acts. And "any provision of an Act directly or indirectly relating to the subject expressed in

Frazier *v.* Railway Company.

the title, and having a natural connection therewith, and not foreign thereto, should be held embraced in it."

Constitution cited: Art. II., § 17.

Cases cited and approved: Cannon *v.* Mathes, 8 Heis., 504; Morrel *v.* Fickle, 3 Lea, 79; State *v.* McConnell, 3 Lea, 333; Luehrman *v.* Taxing District, 2 Lea, 428.

Case cited and distinguished: Ragio *v.* State, 86 Tenn., 272.

13. SAME. *Same. Case in judgment.*

Act 1877, containing the restrictive *proviso* set out in the second head-note *ante,* was entitled "An Act to amend the law in relation to the consolidation of railways." It extended the powers granted to *existing* railroads by Acts of 1871 and 1875 to any railroads then existing or thereafter created, with the limitations therein set out. The former Acts had conferred upon *existing* railway corporations very ample power to consolidate and to issue bonds and make mortgages.

*Held:* The *proviso* in Act of 1877, limiting power of consolidated railway corporations to make mortgages, is germane to the title of the Act; and that the Act, as a whole, has but one subject, which is sufficiently expressed in the title.

---

FROM KNOX.

---

Appeal from Chancery Court of Knox County. H. R. GIBSON, Ch.

INGERSOLL & PEYTON, for Frazier.

W. M. BAXTER, HENDERSON & JOUROLMON, and THORNBURGH & ANDREWS for Defendants.

LURTON, J. Some time prior to 1860 there existed two separate railroad corporations, one known

as the East Tennessee and Virginia Railroad Company and the other as the East Tennessee and Georgia Railroad Company. Each owned and was operating an independent line of railway under charters granted by this State. Under the Internal Improvement Acts of 1851–2, State bonds to a large amount were loaned to each company, and thus each became largely indebted to the State. By an Act passed February 25, 1869, railroad companies so indebted were permitted to consolidate and adopt the name and charter of either of the consolidating companies. Under this Act these two corporations consolidated, adopting the name and charter of the East Tennessee and Virginia Railroad. Subsequently, by an Act passed December 17, 1869, this consolidation was recognized, and the name of the consolidated company changed to East Tennessee, Virginia and Georgia Railroad Company.

On June 15, 1881, this consolidated company executed to the Central Trust Company, of New York, a mortgage to secure an issue of twenty-two millions of its bonds. This mortgage was known and described as its "Consolidated First Mortgage," and all the corporate property and franchises of the consolidated company, including certain other roads, either purchased or built after the consolidation above referred to, were included therein.

On the same day another mortgage, known as the "Income Mortgage," was executed to the same

trustee to secure sixteen and one-half millions of bonds known as its "Six per cent. Income and Mortgage Bonds." All the corporate property and franchises of the company were conveyed herein; subject, however, to the "Consolidated First Mortgage," and, *in addition, the income* of the road was pledged. Default having been made in the payment of interest upon the bonds thus secured, such proceedings were had in the United States Circuit Court for the Eastern Division of Tennessee as resulted in the sale of the mortgaged property and franchises. The purchasers at the sale were a committee of the holders of the bonds, duly authorized to purchase as trustees for the creditors. This committee bid in the entire corporate property for the sum of ten millions of dollars. Of this sum one hundred thousand dollars were paid in cash, the remainder of the bid being paid in bonds of the company, under a scheme agreed upon by the holders of bonds. The title was by deed and decree conveyed to the purchasers.

Subsequently these purchasers, by virtue of an Act passed March 12, 1877, organized as a corporation, and adopted the name of the "East Tennessee, Virginia and Georgia Railway Company." After this reorganization, the purchased roads were regularly conveyed to the new organization by the persons in whom the legal title stood, for the nominal consideration of ten dollars. This foreclosure sale occurred May 25, 1886, and the

other proceedings shortly thereafter and during same year.

Complainant, claiming to be a creditor of the old and insolvent corporation, files this bill under the provisions of §§ 1492–1496, 4168, 4294, 4295 of the Code. The old corporation, as well as the new, are the parties defendant. The bill is filed upon the theory that, under the law of this State at the time the foreclosed mortgages were executed, regulating the execution of mortgages by railroads in this State, that the East Tennessee, Virginia and Georgia Railroad Company had no power to make a mortgage of its property in this State, which should be valid as against judgments for timber furnished or work and labor done, or for injury to persons or property, incurred in operation of the road in this State; and that the property of the insolvent and debtor corporation in the hands of the reorganized corporation is subject to the demands of all such creditors, the purchasers thereof having no other or higher title than the mortgagees had. The bill is filed under §§ 4294, 4295, and 3431, as a creditor's bill, to reach and subject assets of an insolvent corporation and apply them equally to all creditors of the preferred class. A large number of creditors having judgments unsatisfied for injuries sustained in the operation of the old road, or work and labor or timbers furnished, have come in by petition and been allowed, by interlocutory orders, to become co-complainants in the original bill. The learned

Chancellor, upon the whole case, decreed as fol-
lows:

*First.*—That complainant was a creditor, and, as
such, was entitled to judgment and decree against
the East Tennessee, Virginia and Georgia Rail-
road Company; and that his claim was for injuries
sustained in the operation of said railway, in this
State, after the execution of the foreclosed mort-
gages and while the road was being operated by
the mortgageors.

*Second.*—That the East Tennessee, Virginia and
Georgia Railroad Company was an insolvent cor-
poration, and, since June, 1886, had parted with
all of its property and franchises, and had ceased
to perform its functions as a common carrier; and
that complainants have no means at law of obtain-
ing satisfaction of their several demands, unless
they may compel satisfaction from the property of
said corporation in the hands of the new organi-
zation.

*Third.*—That the mortgages of June, 1881, under
which the new company claim title, were subject
to the provisions of the Act of March 24, 1877,
by which Act said company was prohibited from
making any mortgage or creating any lien superior
to claims of the class to which complainants belong.

*Fourth.*—That the East Tennessee, Virginia and
Georgia Railway Company is not an innocent
purchaser.

*Fifth.*—That a receiver should be appointed and
empowered to take possession and sell a sufficiency

10 p

of the property of the insolvent debtor corporation owned by it at the date of the foreclosure sale, and situated in this State, and now in the possession of the reorganized company, to satisfy the several judgments determined in this cause to be entitled to priority over the mortgages of June, 1881.

From this decree the East Tennessee, Virginia and Georgia Railway Company have appealed, and assigned errors upon each of the several matters so decreed. The original complainant, Frazier, has likewise appealed from so much of the decree of the Chancellor as held that his claim should be abated by the sum of $1,491.

We will first dispose of the first assignment of error filed by the railway company, which challenges the character of Frazier's claim, and insists that it is neither for damages to his person or for work and labor, but for a breach of contract, and that, therefore, he is not a creditor of the class entitled to invoke the provisions of the Act of 1877.

Frazier, in June, 1883, was an engineer in the service of the old corporation, and was badly injured by the overturning of an engine. On August 9 thereafter he entered into a contract with the company for the settlement of his claim for damages thus sustained. This contract is too lengthy to be here set out. Its substance and legal effect was that the company, on its part, agreed to pay him the sum of $90 per month for

five years.   He, on his part, agreed to do such work in the shops of the company as he should be called upon to do and which he might be physically able to do.   If any question should arise as to his ability to do the work, then it was agreed that Dr. Deaderick should settle such question; and if he should decide that complainant was able to do the work required, then his payments should be abated for the time so lost.   The contract further provides that all his medical bills should be paid by the company, and that the sum of $1,800 should be paid to him as an advance payment upon the contract.

In consideration of the foregoing, Frazier released the company from all liability for any damages he might otherwise recover.   For several months he was regularly paid the agreed sum of $90 per month.   But when the road passed into the hands of a receiver he was notified that his name had been dropped from their pay-rolls.   Thereafter he was paid nothing more.   Neither before or after this action of the receiver was he ever called upon or required to render any service. During the time he was paid he was utterly unable to render any service; and for the greater part of the remainder of the period covered by the contract he continued to labor under disabilities so serious as to have made it physically impossible that he should render any service in the shops of the company.   After his payments were stopped it is shown that for a part of the time he en-

gaged himself in the management of a small family grocery, and that the service he was able to render was such as could probably have been procured at $35 per month. The Chancellor was of opinion that his monthly claim should have been abated to the extent that he had been able to make earnings in this avocation, and accordingly he abated the gross sum due by $1,491.

We are of opinion that the sum agreed to be paid complainant under this contract was in liquidation of his claim and right of action for personal injuries. The agreement that he should, if able, render service in their shops, if called upon, was a mere incident of the settlement, and the sums agreed to be paid him are not for work and labor, but are agreed payments in liquidation of damages, to be reduced by the value to them of his services in their shops, if he should ever be called upon to so labor, and should refuse, being physically able. His demand is therefore one for personal injuries. We think it was error to abate his claim by the value of his labor in his own store. He was never called upon to perform any labor for defendant, and was unable, if he had been, to have rendered service in their shops for any considerable part of the time. He was under no obligation whatever to remain idle. If there was work of a kind which he could do he was clearly entitled to its fruits, as it was not earned at the loss of his time to defendant. His time and labor belonged to himself, unless he was able to work

Frazier *v.* Railway Company.

in their shops and wrongfully refused to so work when called. To save himself and family from want, he was compelled, in pain and suffering, to engage in the little business he undertook. If defendant had kept its contract with him, he would not, perhaps, have been driven to the necessity he was. It does not lie in the mouth of the defendant to say, under these circumstances, that it was entitled to his time.

The assignment of error as to this matter is sustained, and judgment will go for the full amount of the monthly payments in arrear.

We come now to the principal question, which involves the right of complainants as judgment creditors—the judgments being mainly for personal injuries sustained in the operation of the road in this State—to satisfaction out of the property of the old corporation in the possession and ownership of the East Tennessee, Virginia and Georgia *Railway* Company. We have already stated the title of this company. It is most manifest that the defense of innocent purchaser without notice cannot be sustained. They must stand or fall upon their title as mortgagees. The proceedings in the foreclosure suit are not plead or relied upon in bar of the claim now presented, though a demurrer, as well as the answer, interposes the defense that the remedy of complainants was against the purchase-money. There are two answers to this: The purchase-money was never paid, save in bonds, except a comparatively small sum neces-

sary to pay costs' and counsel fees. Second, the foreclosure proceedings do not undertake to clear the title of the property sold, and no steps seem to have been taken to bring creditors of the class represented by complainants before the Court. If, therefore, the mortgages under which the reorganized company acquired title were invalid as to the judgments of complainants, we see no difficulty in a Court of Equity following the property and subjecting it, in the hands of any but innocent purchasers, to the satisfaction of these prior liabilities. Any liens placed upon the property by the new company are not affected by any decree in this cause, inasmuch as the holders are not parties, and are therefore not concluded. We only decide that the *corporation* is not an innocent purchaser, and its assignment of error to this effect is not well taken. The claim of priority in favor of the judgments of complainants is rested in the bill upon a provision in the Act of March 24, 1877, in the following words:

"*And provided further,* That no railroad company shall have power under this Act, or any of the laws of this State, to give or create any mortgage, or other kind of lien, on its railway property in this State, which shall be valid and binding against judgments and decrees and executions therefrom, for timbers furnished and work and labor done on, or for damages done to persons and property in the operation of its railroad in this State."

The railway company interpose a number of

objections, going both to the applicability and constitutionality of this provision, to the mortgages under which they claim title. The first is, that under the charter of the old company it had power to mortgage, and that this general power conferred in their charter is a contractual right, which could not be affected by any subsequent legislation limiting the power conferred. The charter has not been made a part of the transcript, and it is insisted by complainants that it is not such an enactment, being a special charter, as entitles us to take judicial notice of its terms. This charter is not a mere private Act. It was granted in 1847, and is published as a public Act with the other public Acts of that session. Acts of 1847–8; p. 195. It has been since more than once referred to in other public Acts. Such an Act is entitled to judicial notice. *Perry* v. *N. O. R. R.*, 55 Ala., 413; *Hill* v. *Brown*, 58 N. H., 93; Wharton on Evidence, Sec. 294.

The fifteenth section of the charter granted to the East Tennessee and Virginia Railroad is the only section relied upon as containing the grant of power to issue bonds and mortgage its property. This section is as follows:

"Sec. 15. The said company may at any time *increase its capital to a sum sufficient to complete* the said road, *and to stock it* with every thing necessary to give it a *full operation* and effect, EITHER by opening books for *new stock*, or by *selling* new stock, or by borrowing money on the credit of

the company, and on the mortgage of its charter and works; and the manner in which the same shall be done, and in either case, shall be prescribed by the stockholders at a general meeting. And any State, or any citizen, corporation, or company of this or any other State or country may subscribe for and hold stock in said company, with all the rights and subject to all the liabilities of any other stockholder."

The power here conferred is limited to one purpose, that of *completing its road*, and *equipping* it "with every thing necessary to give it *full operation.*" This old road was completed and in full operation for perhaps twenty-five years before the execution of the mortgages in question, and it is nowhere pretended in the pleadings or proof that either of these mortgages were executed for the purpose of completing or putting into "full operation" the line of road contemplated and authorized by the charter of the old corporation of the East Tennessee and Virginia Railroad. The power of a railway corporation to execute a mortgage of its franchises, or of corporate property essential to its operation, must, by the great weight of authority, be expressly conferred. Such a power is generally implied when the corporation is one strictly private, as a factory or mill. The reason for the distinction is found in the nature of the obligations and duties imposed upon a corporation in many respects a public corporation. Such a corporation cannot, without express authority, abdicate

the functions and duties imposed for public pur-
poses by either a sale or a lease. For the same
reason it may not make a mortgage, for a fore-
closure would bring about a sale and abandonment
of its powers and responsibilities. Jones on Rail-
road Securities, Secs. 1 to 10 inclusive; *Mallory* v.
*Oil Works*, 86 Tenn., 603; *Thomas* v. *Railroad
Company*, 101 U. S., 71.

We are of opinion that the limited power con-
ferred in the charter was not sufficient to authorize
the issuance of bonds and execution of a mort-
gage for any other purpose than that of complet-
ing and equipping the original lines contemplated
and authorized by the charter; and that mortgages
executed more than twenty-five years after the
completion and equipment of the line of the road
authorized by the original charter, and not pur-
porting or shown to be for any such purpose, or
to secure renewal of bonds originally issued for
such purpose, will not be presumed, in the absence
of proof or allegation, to have been executed for
the purpose named in such charter.

The next objection is that the proviso in the
Act of 1877 is obnoxious to Section 17, Article
II., of the State Constitution, which provides that
"no bill shall become a law which embraces more
than one subject, that subject to be embraced in
the title."

The title of the Act of March 24, 1877, is:
"An Act to amend the law in relation to the
consolidation of railways."

The first section amends the Acts of December 12, 1871, and March 12, 1875, by extending those Acts to all railroad corporations " now existing or hereafter to be created in this State, whether under a general or special law or laws, or by virtue of statutes of any other State, ratified and confirmed by the authority of the State of Tennessee."

The second section authorizes any corporation existing, or hereafter created under the laws of this State, or any other State, ratified by this, to consolidate itself with any other railroad whose line shall connect with or intersect the road of such corporation desiring consolidation.

The third section defines the rights and powers of the consolidated roads. Among other powers conferred upon the consolidated companies is that of issuing bonds, and to secure same by a mortgage upon its property and franchises. Three *provisos* are included in this third section. The first declares that "nothing in this Act shall be understood or construed to give or to transfer to or confer upon *any such consolidated company, or person operating such consolidation of railroads,* as provided for in this Act, *or in any other law of this State,* any franchise, right, or immunity or exemption not now granted by the laws of this State to the railway companies which may form part of such consolidated company." The two following provisos and the concluding section are as follows:

"*Provided further*, That no exemption from taxation under the revenue laws of this State, of railroad property and franchises, and capital stock therein, contained in railway charters or other railway law of this State, shall *be by this Act, or any other law of this State providing for such consolidation*, transferred to or conferred upon such consolidated company, or the property and franchises and capital stock therein, of such consolidation of railroads, or of the property appertaining thereto and used in the operation thereof; *and that the State shall have the power, by appropriate legislation, to prevent unjust discriminations against, and extortions for, freights and passage over all railroads in this State. And provided further*, That no railroad company shall have power, under this Act or any of the laws of this State, to give or create any mortgage, or other kind of lien on its railway property in this State, which shall be valid and binding against judgments and decrees and executions therefrom, for timbers furnished and work and labor done on, or for damages done to persons and property in the operation of its railroad in this State.

"SEC. 4. *Be it further enacted*, That this Act take effect from and after its passage, the public welfare requiring it."

The Act of 1871, amended and extended by the Act under consideration, was an Act entitled "An Act granting certain powers to existing railroad corporations." This Act empowered any *existing*

railroad corporation *of this State* (1) to acquire, by purchase or other contract, any other railroad; (2) the right to hold, use, and operate any road theretofore purchased or acquired; (3) the right to consolidate with any other connecting or intersecting road; (4) it gave power to *any existing* railroad corporation to *issue bonds* for *any purpose within scope of its powers,* or to meet indebtedness already incurred, and *power to mortgage its property and franchises* to secure such bonds.

By a proviso the Act was declared not to operate so as to affect any lien in favor of the State or creditors of such corporation, and that such consolidation shall not be complete until approval of majority of stockholders. By the second section, the companies indebted to the State on account of State aid are excluded from the benefits of this Act until they should have paid off such indebtedness.

The Act of March 12, 1875, so amended this Act of 1871 as to extend it to all consolidations existing under the *joint* legislation of *this* and *another State* or *States,* and companies incorporated by *another State,* whose roads connect or intersect in this or another State.

Does this Act of 1877 contain more than one subject, within the meaning of the constitutional enactment that no Act shall become a law which contains more than one subject? The leading case in this State construing this clause of our Constitution is that of *Cannon* v. *Mathes,* 8 Heis., 504.

The case arose upon the construction of an Act entitled "An Act to fix the *State tax on property*," the fourth section of which increased the State tax on *privileges* fifty per cent. upon the existing basis.

Chief Justice Nicholson, in delivering the opinion of the Court, quoted with approval the view of Judge Cooley as to the purpose of the clause in question, as follows: "That the general purpose is accomplished when a law has but one general object, which is fairly indicated by its title.    *    * To require every end and means necessary or convenient for the accomplishment of this general object, to be provided for by a separate Act relating to that alone, would not only be unreasonable, but would actually render legislation impossible." He adds: "The generality of a title is no objection to it so long as it is not made to cover legislation incongruous in itself, and which by no fair intendment can be considered as having a necessary or proper connection. The Legislature must determine for itself how broad and comprehensive shall be the object of a statute, and how much particularity shall be employed in the title defining it." The learned Chief Justice then concludes by saying: "We concur in these general views as sound and practical, and by them the validity of the Act in question must be tested." The Court held, in the case then under consideration, that an examination of the different sections of the Act indicated that the general subject of the Act was State *revenue*, and that a tax upon

*privileges* was germane to the subject of a tax on property. Concerning the title of the Act, the Court, after determining that the object of the constitutional provision concerning the title of Acts was to prevent surprises or fraud upon the Legislature, by means of provisions in bills of which the title gave no intimation, and which might therefore be overlooked, and carelessly or unintentionally adopted, laid down the rule for the construction of this clause, as to the titles of bills, to be: "*That any provision of the Act directly or indirectly relating to the subject expressed in the title, and having a natural connection therewith, and not* foreign thereto, should be held embraced in it." This liberal rule of construction finds illustration in a number of cases by this Court. The case of *Morrel* v. *Fickle,* 3 Lea, 79, is in point: An Act entitled "An Act to establish a Chancery and Law Court at Bristol, in the county of Sullivan," was held to embrace the establishment of separate Chancery and Circuit Courts at Bristol, and that the establishment of two separate Courts constituted but one subject, that subject being the establishment of such additional Courts for Sullivan County as were needed, and this subject was sufficiently indicated by the title. In *State* v. *McConnel,* 3 Lea, 333, it was held, that an Act entitled "An Act to create and establish the Sixteenth Judicial Circuit in this State," which detached the county of Trousdale from the Seventh Circuit and attached it to the Fifth Circuit, was valid. This conclusion

Judge Cooper put upon the solid ground that "the establishment of a new circuit in a State already divided into Judicial Circuits must necessarily require some change in the circuits previously established, and such change may well be considered germane to the subject and embraced in a caption embodying the general object."

In the case of *Luehrman* v. *Taxing District*, 2 Lea, 428, an Act entitled "An Act to repeal the charters of certain municipal corporations, and to remand the territory and inhabitants thereof to the government of the State," was held to embrace a provision turning the corporate property of such municipalities over to the State, to remain public property for the uses to which it had hitherto been applied. So, in the same case, it was held that an Act entitled "An Act to establish Taxing Districts in this State, and to provide the means of local government for the same," was valid, and embraced but one subject sufficiently indicated by the title, although the Act granted municipal franchises to the communities within the limits of the Taxing Districts, and gave to the corporations thus created all the legislative, judicial, and police powers of an incorporated city, and contained specifications of offenses against the district, with penalties and punishments.

The learned counsel have in argument pressed upon us the case of *Ragio* v. *State*, 2 Pickle, 272, seeming to find in it some principle of construction hostile to that laid down in *Cannon* v. *Mathes.*

That case does not contain any rule or principle for the construction of the constitutional clause in question in any way antagonistic to the well-settled doctrine heretofore frequently announced by this Court. In the ascertainment of the general subject of an Act, this Court must look to the provisions of the particular Act under consideration. If, upon our knowledge of affairs, the Act seems to contain matters not germane, but incongruous, we must declare it obnoxious to the provision prohibiting two subjects.

In the Ragio case the title was exceedingly restrictive, and implied legislation closing only barber shops on Sunday. Upon the facts as they appeared in that case we thought that there was no necessary connection between barbering and keeping bath-rooms. Both might have been prohibited in an Act under a title broad enough to comprehend the two things. We therefore held that the subject of the Act, as indicated by the title, was the prohibition of barbering on Sunday, and that the closing of bath-rooms was not germane to such a title, the two occupations not being necessarily so connected as to be embraced under the one head of barbering. The subjects of legislation are infinite. The determination as to whether the several provisions of an act are congruous and germane, becomes largely a question of fact. Particular decisions cannot often be controlling in determination of subsequent cases arising out of this constitutional provision.

Cases will only serve as illustrations of the application of the liberal rule of construction adopted in *Cannon* v. *Mathes*, and frequently approved in subsequent cases. The Ragio case, upon its facts, was rightly decided, and no rule of decision is laid down in that case, or is to be drawn from the decision, which in any way conflicts with the earlier cases on the same subject.

Let us test the constitutionality of the Act of 1877 by the principles so clearly announced by Chief Justice Nicholson.

The object of the Act is *to regulate and define the terms upon which the State was willing to confer upon railroad corporations the power to consolidate,* and to define the powers of such consolidated companies. We have already seen that a railway corporation may not, without express authority, abdicate its functions and duties, either by a sale, or lease, or mortgage. *A fortiorari,* it may not lose its own identity by suffering consolidation with another. It would therefore seem to need no support of argument that when the State, by legislation, undertook to confer upon all railroad corporations the power to absorb another, or to suffer an absorption by consolidation, it might well couple the grant of so extraordinary a power with the *condition* or proviso that the corporations so empowered to consolidate should not have power, before or after such consolidation, to make any mortgage or create any lien which should affect the class of creditors to which complainants be-

11 P

long. This provision seems.to be directly connected with the subject of consolidation, in that it is a *condition* upon which *the power to consolidate* and the unlimited power thereafter to execute mortgages is granted. The subject of the Act is sufficiently indicated by its caption, even under a more rigid construction of the constitutional clause. on this matter, than the well-settled rule would require. If the title of this Act had been "An Act defining the terms and conditions upon which the power to consolidate is granted to all railroad corporations, and defining the powers of consolidated companies," it would be hardly more explicit than the title of this Act, which purports to be an Act *amending the whole law on the subject of consolidations.*

Now, if in the Act with the supposed title the first section had provided " that no railroad company shall have power to make any mortgage or create any lien which should be superior to judgments for timbers furnished, or work and labor done, or injuries to persons or property," and the second section "that all such corporations should have power to consolidate," etc., we would then have an Act which, by the most rigid construction, would contain but one subject, and that subject distinctly indicated by the title. Yet any fair construction of the Act as actually worded and its title as written brings us to the same result. The proviso is germane to the subject of consolidation, and the title sufficiently indicative of

this subject to prevent surprise or fraud, or the unintentional adoption of the Act in ignorance of this provision.

It is next insisted that this limitation upon the power to mortgage contained in the Act of 1877 is repealed by the Act of March 15, 1881. This latter Act confers the power to mortgage in very broad terms, and is extended to all railroad companies existing under the laws of this or another State, and to all companies which might thereafter be created. The Act contains no repealing provision, and in no way refers to any former Act upon this subject. It does not, therefore, in terms undertake to repeal any former legislation. Repeals by implication are not favored. An Act will never be held to repeal by implication another Act, unless it clearly appears that the two Acts cannot stand together. The repugnancy between the two Acts must be plain and unavoidable. *Hockaday* v. *Wilson*, 1 Head, 114; *Buchanan* v. *Robinson*, 3 Bax., 152; *Home Insurance Company* v. *Taxing Dist.*, 4 Lea, 644.

The Act of 1877 contains the proviso in favor of what may fairly be called the claims arising from operation of the railway. The Act of 1881 does not contain it. This proviso in favor of operating expenses and damages for personal injuries is not an uncommon or unusual one in this State. It first appears in our legislation in the Act of February 19, 1873. This was an Act entitled "An Act to authorize certain railroad companies

to issue consolidated or income bonds, and to mortgage their property to secure same for the purpose of paying off their indebtedness." By the third section power is given to any railroad company in the State owing outstanding floating debts to issue bonds, to be known as "income bonds," for an amount sufficient to pay off such indebtedness, and to secure same by a mortgage of its "rents and profits," and all of its other property. This is perhaps the first general legislation expressly authorizing a mortgage of the *income* of railroads, and this power is conferred upon the provision that "*no such mortgages shall bar any judgments against such roads for work or labor or damages to persons or property.*" Acts of 1873, p. 8.

Thus we see that it was the clear purpose of the Legislature that the power to mortgage income should be coupled with the proviso that claims of the character presented by complainants should not be affected. Again, by the Act of 1877, Ch. XII., p. 17, being an Act authorizing purchasers at a foreclosure sale of a railroad to organize themselves into a corporation, and settling the power of such reorganized company, the same proviso is repeated, and in such broad terms as to indicate the purpose of the Legislature that this disability should apply *not only to companies so reorganized thereunder, but that no Act authorizing mortgages should be held as authorizing a mortgage or lien which should affect such claims.*

Claims of the class represented by complain-

ants are for the most part exceedingly meritorious, as against creditors by bond and mortgage, for the reason that such claims arise from the necessary operation of the road while in the hands of the mortgageor by agreement with the mortgagee. Possession, with the right to operate and receive the income, it would seem, should involve the right and duty to apply such income primarily to operating expenses. Without this is done, there can be no operation of the road by the debtor corporation and no payments of interest to the mortgagee. Hence, it would seem that a mortgage upon a going railroad, to secure a debt to mature at a distant date, whereby the mortgageor is left in possession, would contemplate, even when the income is mortgaged, that the operating expenses, including damages incident to such operation, should be a first charge upon such income, and that only the net income, after payment of all such charges, should pass or be applicable to payment of mortgage debt. In such case, if income was applied to payment of mortgage debt or interest, and operating expenses were left unpaid, it would follow that creditors of the latter class ought to be allowed to marshal the assets and receive satisfaction out of the *corpus* to the extent that income had been diverted from payment of operating expenses. *Clay* v. *E. T. & V. R. R. Co.*, 6 Heis., 421; *Fosdick* v. *Schall*, 99 U. S., 356; *Burnham* v. *Bowen*, 111 U. S., 776; *Gilman* v. *I. & M. Telegraph Company*, 91 U. S., 603; *Galveston R.*

*R. Co.* v. *Cowdery*, 11 Wall., 489; *Parkhurst* v. *Railroad Company*, 19 Md., 147; *Ellis* v. *Boston R. R.*, 107 Mass., 1.

It is unnecessary, however, to decide that such claims would be entitled to priority of satisfaction out of income. The state of the pleadings do not, perhaps, raise this, and it is unnecessary, in the view we have of the statute. We only allude to this equitable principle in connection with its repeated expression in our legislation prior to the Act of 1881, that we may in this light ascertain whether there is such repugnancy between the Act of 1881 and that of 1877 as to indicate a legislative intent that the former provision should by the latter be abrogated. This intent we do not see, and the repugnancy is not obvious. The two Acts may stand together, and in such case it is our duty to so declare. The argument that the proviso in the Act of 1877 was intended to apply only to such consolidations as should thereafter occur, is practically disposed of by the view we have already announced as to the true construction of that Act. If the view we have taken is correct as to the meaning of that Act, then it is a proviso affecting *all railroad companies alike, whether they shall thereafter consolidate or not.*

It is unnecessary to determine whether the provision of the Act of February 19, 1873, and that of March 16, 1877, limiting the power of railroad corporations with respect to their power of mortgaging property, do not effectually operate to give

superiority to the claims of creditors of the class protected by the subsequent Act of March 24, 1877. It is enough to decide, as we do, that the proviso of the Act of March 24, 1877, is a valid and constitutional limitation upon the power of the East Tennessee, Virginia and Georgia Railroad Company to mortgage its property in this State; and that complainants are entitled to the relief they seek against the property of that corporation in this State, now in the custody and control and ownership of the reorganized corporation.

In view of the well-known fact that railroads are now, for the most part, built with bonds, and operated largely for the benefit of such creditors, the legislation whereby the debts and liabilities created by the mortgageors as operating expenses in the course of their operation are secured as against such bonds, is salutary in a high degree, and rests upon principles of unquestioned equity and right.

The decree of the Chancellor will be affirmed, save as modified herein.