A. H. CLARK ET AL., Appellants, v. MIDLAND BLAST
FURNACE Co., Respondent.

St. Louis Court of Appeals, February 23, 1886.

1. LANDLORD AND TENANT—LEASE—CONTRACTS.—Under an agreement
by which the plaintiff "leased, conveyed, and transferred" to the
defendant for a term of years, a tract of land "upon which is an
iron bank," and granted "the exclusive right to mine" the same,
and provided that the defendant might terminate the lease at any
time by giving the plaintiff thirty days' notice, and fixed the rent
definitely, the defendant is liable for rent for the time during which
he occupies under the agreement, irrespective of the amount or
character of the ore in the "iron bank."

2. —— EVIDENCE.—Evidence that iron ore contained only thirty-three
and one-third per cent. of metallic iron is not evidence that the ore
was not merchantable.

APPEAL from the Dent County Circuit Court, C. C.
BLAND, Judge.

*Reversed and remanded.*

E. A. SEAY, for the appellants; W. S. RELFE, of
counsel: To justify an instruction of non-suit it is not
sufficient that the evidence is weak; there must be no ev-
idence. *Routsong v. Railroad*, 45 Mo. 236. If there is
any evidence it must go to the jury, however slight, and
whether direct or inferential. *Emerson v. Sturgeon*, 18
Mo. 170; *Woods v. Insurance Co.*, 50 Mo. 112. The pay-
ment by the defendant is a condition precedent to the
exercise of his right to determine the lease. *Nichols v.
Larkin*, 79 Mo. 264, and authorities cited; Tayl. Land.
& Ten. (7 Ed.) 237, sect. 276, and authorities cited. We
insist that even if no "merchantable" ore could be found
upon the lands, the defendant had, by his contract, elected
to be bound for payment of rent, at least until it term-
inated the lease by notice and payment. This was a duty

and burden cast upon the defendant by his own express contract, and it is bound by it notwithstanding accident or inevitable necessity, because he might have provided otherwise. Tayl. Land. & Ten. (7 Ed.) 322, sect. 375; *Davis v. Smith*, 15 Mo. 469; *Beale v. Thompson*, 3 Boss. & P. 420; *Peck v. Ledwidge*, 25 Ill. 112. He might have provided otherwise, but he did not. The following authorities, we submit, are conclusive as to the whole case: *Harlan v. Lehigh C. & N. Co.*, 35 Pa. St. 287; *Hart v. Windsor*, 12 Mees. & W. 88; *Sutton v. Temple*, 12 M. & W. 52; *Cleves v. Willoughby*, 7 Hill (N. Y.) 86; *Howard v. Doolittle*, 3 Duer, 464; *Jowett v. Spencer*, 1 Exch. Rep. 648; *Ridgway v. Sneyd*, Kay, 627: *Bute v. Thompson*, 13 Mees. & W. Exch. 487; *Mellers v. Devonshire*, 16 Beav. 252; *Morris v. Smith*, 3 Douglass, 279; *Phillips v. Jones*, 9 Simon, 519.

A. & J. F. LEE, for the respondent: "Words of proviso and condition will be construed into words of covenant, when such is the apparent intention and meaning of the parties." 2 Pars. Cont. (7 Ed.) foot p. 642, "Where the language of an agreement can be resolved into a covenant the judicial inclination is to so consider it." *Paschall v. Passmore*, 15 Pa. St. 295, 307. The language in the contract under consideration is to be construed most strongly against the grantors, and the statement that the land contains an iron bank is presumed to be the statement of the party most conversant with the worth and character of the land, viz. : its owner. There can scarcely be any doubt as to which party such a statement should be attributed, but if the "grantor has left the point doubtful it shall be construed most favorably for the grantee. The grantor shall not take advantage of a difficulty which he has himself created." 3 Washb. Real. Prop. (4 Ed.) 396, marg. 628. Appellants insist that there is a covenant tô pay for a certain number of tons of ore every year; that this amounts to a rent, and that that number of tons must be paid for whether they can be mined or not. The law is not so inconsistent with

sound ethics as this. See Blanchard & Weeks, Mines & Min. 428 (Ed. of 1877); *Clifford v. Watts*, L. R. 5 C. P. 577; *Hanson v. Boothman*, 13 East. 22; *Jones v. Shears*, 7 Car & P. 346; *Cook v. Andrews*, 36 Ohio St. 174; *Brick Co. v. Pond*, 38 Ohio St. 65.

THOMPSON, J., delivered the opinion of the court.

This action is brought to enforce the terms of the following agreement, so far as to recover the amount of royalty agreed to be paid thereunder for the first year during which the agreement was in force:

"This contract made and entered into, * * * *Witnesseth*, That for and in consideration of the sum of one dollar to the said parties of the first part, duly paid, the receipt whereof is hereby acknowledged, they, the said parties of the first part, hereby lease, convey, and transfer unto the said party of the second part, for a term of five years from this date, the following real estate, situate in the county of Dent, and state of Missouri, to wit: The south one-half of lot number one of the southwest one-fourth of section eighteen, township number thirty-three, north of range four west (upon which there is an iron bank), with the exclusive right to mine said land for iron ore and to remove iron ore therefrom, and further, give the right to use any timber on said tract of land necessary for fuel, buildings, or other uses connected with the mining thereof, and give and grant the right of way over and through said land for wagon roads, tramways, or railroads.

"The said party of the second part agrees to pay to the said H. B. C., A. H. C., and E. O. C., one-third to each, as royalty, the sum of sixty cents for each unit of two thousand, two hundred and forty pounds of merchantable iron ore mined and removed from said land, and to make such payments on the twenty-first day of each month for the ore mined and removed during the preceding month, or such payment may be made within thirty days after written demand made therefor.

"The said party of the second part further agrees to mine and remove from said land, if the same can be found by ordinary modes of mining, one thousand, seven hundred units of two thousand, two hundred and forty pounds each of iron ore during each year of the continuance of this lease. And if the said party of the second part should fail to mine and remove in any year while the lease is in force, the said amount of one thousand, seven hundred units of two thousand, two hundred and forty pounds each, it hereby agrees to pay the royalty at the rate above specified for the said amount of one thousand, seven hundred units of two thousand, two hundred and forty pounds each during such year; provided, that if under the provisions of the above clause the said second party shall at any time pay for ore not mined and removed before such payment, it shall have the right to mine and remove the said ore so paid for in advance of mining and removal, at any subsequent time during the continuance of this lease, without any further payments of royalty thereon.

"In the event of the failure of the said second party to mine and remove in any year the amount of ore above specified, the payment of royalty for that portion of one thousand, seven hundred units of two thousand, two hundred and forty pounds each, not mined in such year, shall be made at the first specified time herein for payment of monthly royalty occurring after the expiration of each year.

"It is further agreed and contracted that in the event a railroad should be built to within one-half mile of said land and operated so as to connect with Salem, Mo., and by the building and operation of such railroad the cost of transportation from said land to Salem, Mo., is lessened as much as fifteen cents on each unit of two thousand, two hundred and forty pounds of ore, then from and after the construction and operation of such railroad and consequent reduction of transportation, the royalty, as herein specified, shall be increased to seventy-five cents for each

unit of two thousand, two hundred and forty pounds of iron ore; such increase of royalty to apply to all ore mined and removed after the completion and operation of such road and consequent reduction of freight, which had not been previously paid for; and also to such ore as may be paid for before removal, when such payment shall be made after the completion of such road and consequent reduction of freight.

"It is further agreed, by and between the parties hereto, that in the event the railroad from Salem to Riverside should at any time during the continuance of this lease cease to be operated, and no other railroad is built from Salem, Mo., to a point as near or nearer to said bank than the present terminus of the Riverside road, and by such discontinuance of operation of said railroad from Salem to Riverside, the cost of transportation of the ore from said bank to Salem, Mo., be increased, then from and after such discontinuance of operation of said railroad and while such increased transportation shall necessarily be paid, the said party of the second part shall only be required to mine and remove from said bank eight hundred and fifty units of two thousand, two hundred and forty pounds each of ore in each year.

"It is further agreed and contracted between the parties hereto, that if at any time during the continuance of this lease, the said second party fails to find sufficient merchantable iron ore on said land to justify the working of the same, or, if in its judgment the said land can not be profitably mined for iron ore, then the said party of the second part shall have the right to terminate this lease by giving to the said party of the first part thirty days' notice of its intention so to do, and by paying to the said parties of the first part all sums that may be due to them under this contract at such time; and the said party of the second part, having complied with all the terms and conditions of this contract, shall have the right to remove from said land all tools, machinery, and buildings placed by it thereon. In testimony whereof," etc.

The answer is a general denial and an allegation that since the execution of the contract the defendant made a thorough investigation of the premises described therein, and mined the same for the purpose of ascertaining whether there was any merchantable iron ore thereon, and of removing the same if found; and that it could find and did find no merchantable iron ore thereon, and none which could be removed by the ordinary modes of mining; and that there has been no merchantable iron ore thereon and none that could be removed by the ordinary modes of mining since the date of the execution of the contract.

At the trial the following evidence was introduced on behalf of the plaintiffs:

1. The original lease in question, which was read.

2. Testimony showing that no notice was given on the part of the defendant of its desire or intention to terminate the lease until May 28, 1883, more than a year after its execution, at which time the defendant gave a written notice to that effect, which was read and appears in the bill of exceptions.

3. Proof that demand was duly made by the plaintiffs of the defendant for the payment of the year's rent or royalty under the term of the lease, amounting to one thousand and twenty dollars, and the defendant's refusal to pay the same.

W. H. Lee was then introduced, the record does not show by which party, and testified in substance as follows: "I am president of the Midland Blast Furnace Company, was on the seventh day of February, 1882, and signed and sealed the contract of lease read in evidence. Some time in the month of March, 1882, the defendant in pursuance to said contract so read in evidence, entered into the land there described and leased, and commenced to mine the same, and sink shafts, and run drifts on the same, and held and worked from time to time, with a sufficient force to develop the same, until some time in December, 1882; no work or mining was done on said land by the defendant after that time."

The question was asked: "What was the quality of the ore there found; was it merchantable; and what percentage of metallic iron did the ore contain?" To which question the plaintiffs objected, for the reason that the same was irrelevant and incompetent. The objection of the plaintiffs was overruled and the plaintiffs excepted at the time.

The witness testified that the ore mined contained only thirty-three and one-third per cent. of metallic iron and was not merchantable; that ore situated as was the ore on the land described in the plaintiffs' petition would have to contain fifty per cent. of metallic iron before it would be merchantable. The witness stated he was a dealer in iron ores, and operator of iron mines in this country, and was an expert. He stated that the defendant made a very thorough examination of the mine with a view of finding merchantable ore, and to that end had shafts sunk of the depth of ten feet or upwards, and drift holes or tunnels extending to the west and the south far enough to have developed the mine if the same had not been valueless, as such; that there was a prospect of ore on the land, or a surface show of ore; that the shaft followed down the surface show to the bottom of the ore, or as long as there was any show of ore; that the prospect was well worked and to an extent sufficient to demonstrate to a reasonable certainty that it contained no merchantable ore. The prospect was more thoroughly worked, with a view of ascertaining whether there was ore on it or not, than any mine we have ever prospected, except one, that near our furnace in Crawford county, Mo."

This was all the evidence introduced. Whereupon, the court, at the instance of the defendant, instructed the jury to find a verdict for the defendant.

We are of opinion that the court erred in so directing the verdict. We do not regard it as material to decide whether this instrument is a lease or a mining license, although the law annexes certain incidents to a lease which it does not annex to a mere license. But so far as

the present case is concerned, we regard this as a mere debate about a definition, which leaves untouched the principle that this contract, like every other written contract, must be interpreted so as to give effect to the intent of the contracting parties as gathered from all the parts of the instrument itself. It is to be observed in the first place that this instrument contains no warranty or representation on the part of the lessors, for we shall call them such for convenience, that the land contains merchantable iron ore, or iron ore containing any given percentage of metallic iron, or iron ore of any specified quality. It merely contains the recital "upon which there is an iron bank," which we do not regard as being either a warranty or a representation that there is a bank of merchantable iron ore upon the land. We regard it as a mere matter of description and identification, following as it does the description of the land by metes and bounds. Then, it is an unquestioned principle in regard to contracts of lease of land, that there is no implied warranty that the land is fit for the particular purpose to which the lessee may intend to put it.

It is further to be observed that this instrument contains apt words to pass the exclusive possession to the land in question to the defendant for a term of five years : "The said parties of the first part hereby lease, convey, and transfer unto the said party of the second part the following real estate," describing it by metes and bounds, "with the exclusive right to mine said land for iron ore therefrom." It then provides in the last paragraph the manner in which in certain contingencies the defendant may terminate the lease before the expiration of these five years. Now, mutuality of obligation is essential to the very idea of a contract so long as it remains unexecuted on both sides. The plaintiffs, by the terms of this instrument, became bound to keep the defendant in quiet possession of this land for the term of five years, and to allow it the exclusive privilege of mining the land for iron ore and removing iron ore therefrom, to-

gether with certain other privileges named. The defendant, on its part, agreed to pay for this privilege a certain minimum rent or royalty per annum; it is immaterial by what name it is called.

Now, suppose that, before the expiration of the first year, the plaintiffs had found some one who would pay them more for this exclusive privilege, or had concluded that they could do better by mining the land themselves, and had gone to the defendant and said: "You are not mining nor removing any iron ore from the land; you are merely experimenting. What you are doing does not offer any prospect of profit to us. We, therefore, demand possession of our land;" could any one argue that the defendant would have been bound to surrender possession? The kernel of the question seems to lie right here. During the year for which the plaintiffs now claim rent the defendant held, and under the terms of the lease was entitled to hold, the exclusive possession of the land. It excluded the plaintiffs from whatever benefits they might have derived from the possession of it. If its present position is correct, that there was no merchantable iron ore on the land, it could have terminated it at any time by giving a month's notice. It did not see fit to do this. Having elected to keep the land, it is difficult to understand upon what principle it can deny the obligation to pay the rent agreed upon.

The argument submitted, and ably and forcibly presented on behalf of the defendant, is, that this is a mere mining license; that the plaintiffs were to pay royalty for ore mined or which might be mined; that the fundamental idea of the instrument is that there was upon the land merchantable iron ore in sufficient quantities, so that the defendant could mine in any one year the minimum amount upon which the contract requires it to pay royalty, whether in fact such amount should be mined or not. Whereas the contention is that there was no merchantable iron ore on the land, and that the entire purpose of the instrument has, therefore, failed, and the

defendant is under no obligation to pay anything to the plaintiffs for the mere privilege of conducting certain experiments on the land to ascertain whether it contained a bank of merchantable iron ore or not.  Decisions in other jurisdictions are appealed to which lend plausibility to this reasoning.  *Clifford v. Watts*, L. R. 5 C. P. 577 ; *Hanson v. Boothman*, 13 East. 22 ;  *Cook v. Andrews*, 36 Ohio St. 174; *Brick Co. v. Pond*, 38 Ohio St. 65.

But this argument proceeds upon an hypothesis which is not borne out by the record.  As we interpret the testimony of Mr. Lee, above quoted in full, it does not amount to a statement that there was no merchantable ore on the land.  He says that "the ore mined contained only thirty-three and one-third per cent. of metallic iron and was not merchantable ; that ore situated as was the ore on the land described in the plaintiffs' petition, would have to contain fifty per cent. of metallic ore before it would be merchantable."   The witness was president of the defendant corporation,  was manifestly interested on the side of the defendant, and must be understood as stating as favorable a case for the defendant as the facts would warrant.  If, therefore, any doubt arises upon the meaning of this statement, the plaintiffs are entitled to the benefit of it, especially upon a demurrer to the evidence.   Interpreting it most strongly against the party from whom it proceeds, we think it fairly means no more than the statement that ore containing only thirty-three and one-third per cent. of metallic iron was not merchantable in the situation in which the land was.  W . regard the two sentences, taken together, as a statement that there was no merchantable ore on the land,  with a qualification giving the witness' understanding of the term merchantable ore, which was merchantable at the place of production.   But this, it seems to us, is very different from the statement that it was not merchantable at all.   A commodity is merchantable when it is salable at market, not when it is salable where it is

produced.    Corn has been burned for fuel in Kansas and
Nebraska, because it was so far from market that the price
which could be obtained at market would not pay the
cost of getting it there.    But it was nevertheless mer-
chantable.    It would have been salable at market, and
that is what we understand to be the meaning of the
word merchantable as used in mercantile contracts.    It is
quite different in meaning from the word profitable, and
the learned counsel for the defendant candidly admit
that this is so.    An iron bank might contain merchant-
able ore, the best ore, in fact, and yet it might not be
profitable to work it, owing to a depression in the iron
trade, distance from the furnace, or from market, or to
other circumstances.    If the evidence adduced on the
part of the defendant had gone further and had shown
that iron ore, which contains but thirty-three and one-
third per cent. of metallic iron, is not merchantable at St.
Louis, at Pittsburg, or at other principal seats of iron
manufacture, we should say that a case had been stated
which would lend plausibility to the defence set up,
though we should still regard the defence untenable.

In fine, the testimony adduced on behalf of the de-
fendant seems to amount to no more than this : that after
conisderable experimenting the defendant concluded that
the land could not be profitably mined for iron ore.    This,
if true, brought the case within the terms of the last para-
graph of the contract, which gave the defendant the
right to terminate the lease upon giving thirty days' no-
tice to the plaintiffs.    Not having elected to exercise this
right, the defendant must be regarded as holding the
land under the lease and subject to the covenants which
the lease imposed on the defendant in respect of the pa-y
ment of rent.

The judgment will be reversed and the cause re-
manded.    It is so ordered.    All the judges concur.