COAL CREEK, ETC., CO., v. TENNESSEE COAL, ETC., CO.

(*Nashville.* March 26, 1901.)

1. CORPORATIONS. *Have corporate existence, when.*

The complainant corporation, having been chartered in 1872 by decree of a Chancery Court for a term of twenty years, and having had its charter limit extended five years by Ch. 197, Acts 1887, and the persons constituting the corporation having before its dissolution availed themselves of the privilege granted by Ch. 146, Acts 1893, has such corporate existence as entitles it to mainta'n this action for collection of a debt. (*Post, p. 666.*)

Acts construed: Acts 1887, Ch. 197; Acts 1893, Ch. 146.

Case cited: Heck v. McEwen. 12 Lea, 97.

2. SAME. *Power to lease property.*

A private corporation has inherently, and by statute, the power to lease to another corporation, as well as to individuals, all, or at least such part, of its property as will not cripple its exercise of its franchise. The statute that authorizes corporations to "dispose of" their property confirms to them the power to lease same. (*Post, pp. 667–672.*)

Code construed: § 1472 (T. & S.).

Cases cited and distinguished: Marble Co. v. Harvey, 92 Tenn., 115; Mallory v. Oil Works, 86 Tenn., 604.

3. SAME. *Same.*

Private corporations are not embraced by Acts 1887, Ch. 196, which regulates the method and formalities by which corporations may make valid leases and dispositions of their property and franchises. That statuté, though general in terms, is restricted by necessary construction to quasi public corporations. (*Post, pp. 672–677.*)

Act construed: Acts 1887, Ch. 196.

Cases cited: Parker v. Bethel Hotel Co., 96 Tenn., 252; Frazier v. Railroad, 88 Tenn., 153.

Coal Creek, etc., Co. *v.* Tennessee Coal, etc., Co.

' 4. SAME. *Same.*

Acts 1887, Ch. 196, prescribing method and formalities for a valid leasing or disposition of property and franchises by corporations, does not, even as to quasi public corporations, require observance of its provisions as to ordinary leases and dispositions of corporate property that do not cripple or interfere with the proper discharge of corporate duties, but only to the lease and disposition of those corporate properties and franchises which are coextensive with corporate life and are essential to corporate integrity and to the proper discharge of those corporate duties and functions that are imposed by law. (*Post, pp. 672–677.*)

Act construed: Acts 1887, Ch. 198.

5. SAME. *Neglect or abuse of corporate privileges.*

Unlawful neglect or abuse of corporate privileges affords no defense to an action of the corporation to recover a debt. . (*Post, p. 672.*)

Case cited: Barron *v.* Turnpike Co., 9 Hum., 304.

6. STATUTES. *Construction of.*

When the intent of a statute is clear, general words will be restrained to that intent, and words of narrower import will be expanded to embrace and effectuate that intent. Words may be modified, altered or supplied so as to obviate repugnancy to or inconsistency with such intent. (*Post, pp. 672–677.*)

7. LEASE. *Stipulation for liquidated damages.*

A stipulation in a lease of a coal mine for the term of twenty-five years, subject to surrender at the option of the lessee at the end of any year, constitutes a valid contract for liquidated damages, and is enforceable as such, which provides that the lessee shall take out at least a specified number of bushels per annum, at a specified royalty per bushel, paying the rental quarterly, and that, in default of taking out the specified quantity, he should, nevertheless, at the end of the year, pay for that amount. (*Post, pp. 677–684.*)

Case cited: Railroad *v.* Cabinet Co., 104 Tenn., 568.

8. SAME. *Collecting rental, no bar to claim for liquidated damages.*

Collection of rentals on the coal actually taken out by the lessee constitutes no bar to a subsequent action for his breach of contract in failing to take more, for which liquidated damages are stipulated. (*Post, pp. 684–687.*)

Coal Creek, etc., Co. v. Tennessee Coal, etc., Co.

9. SAME. *Not void by reason of inferior quality of coal.*

Under a finding of the Court of Chancery Appeals, that the coal was not unmerchantable, but merely of inferior quality, this Court cannot declare the minimum royalty provision in the lease of a coal mine void for want of consideration. (*Post, pp. 687, 688.*)

FROM DAVIDSON.

Appeal from Chancery Court of Davidson County. H. H. COOK, Ch.

LUCKY, SANFORD & FOWLER and W. L. GRANBERY for Coal Creek Mining & Mfg. Co.

BAXTER & HUTCHESON and R. F. JACKSON for Tennessee Coal, Iron & Railroad Co.

BEARD, J. The bill in this cause was filed to collect royalties alleged to be due to the complainant under a lease made on January 30, 1888, by the complainant to J. W. Renfroe and others, assigned by the latter to the Cumberland Coal Mining Company, and by that company to the defendant, both assignments having been made with the consent of the complainant; also another lease, dated January 25, 1892, made by the complainant to the Cumberland Coal Mining Company, and by the latter, with the consent of the complainant, assigned to the defendant.

It is unnecessary to set out all the clauses in

these leases, inasmuch as the present controversy is narrowed to the claim depending upon a proper construction of a leading clause in each. That in the lease first mentioned is clause six, and is in the following words:

"6. And the said parties of the second part hereby covenant and agree that they will pay to the party of the first part for all steam or run of mine coal, mined or agreed to be mined, a rent, or royalty, of one-half ($\frac{1}{2}$) cent per bushel of eighty (80) pounds; and will also pay a rent, or royalty, of one (1) cent per bushel of eighty (80) pounds for all lump or domestic coal mined, or agreed to be mined, and the said party of the second part also covenant and agree that they will mine and take from the said premises hereby (demised) not less than twenty-five thousand (25,000) tons, or six hundred and twenty-five thousand (625,000) bushels of coal during each of the years 1889 and 1890; and for every year thereafter during the continuation of this lease they agree to mine and take from said premises not less than fifty thousand (50,-000) tons, or one million two hundred and fifty thousand (1,250,000) bushels of coal; and that if during each of the years 1889 and 1890 they shall not have mined and taken from said demised premises at least twenty-five thousand (25,-000) tons, as herein provided, then they shall pay to the party of the first part, on the twenti-

eth day of January next succeeding the expiration of each year, in cash, as liquidated rent for said premises during such year, such sum of money as added to the amount of rent, shall be equal to the sum of four thousand ($4,000) dollars, and for the full term of this lease after the expiration of the year 1890, in case they shall not have mined and taken from the said premises at least fifty thousand (50,000) tons each year as herein provided, then they shall pay to the party of the first part, on the twentieth day of January next succeeding the expiration of each year, in cash, as liquidated rent or royalty for said premises during such year, such sum of money as added to the amount of rent or royalty, shall be equal to the sum of eight thousand ($8,000) dollars; that they will keep all necessary and proper books showing the amount of coal mined, and will make to the party of the first part regular monthly and quarterly reports, in writing, showing the number of bushels of coal mined in each month and quarter, and showing separately the amount of said coal used for coke, if any. Such quarterly reports to be made on the first days of January, April, July, and October, and said monthly reports to be made on the first day of each month in each and every year during the continuance of this lease, said reports to be made in duplicate, one copy to be delivered or mailed to the secretary of the party

of the first part, at his office, and the other to the treasurer of said party of the first part, at his office in Knoxville, or wheresoever said office may be; and said parties of the second part will within thirty (30) days after the time for making each of such quarterly reports, pay to the treasurer of the party of the first part, or to such other person or corporation as may hereafter be designated by the party of the first part, all the rents or royalties accrued for the coal so mined or agreed to be mined by the parties of the second part during such preceding quarter, which rents and royalties shall be considered due at the end of each quarter, and shall be paid within thirty (30) days thereafter."

While the controversy, so far as this lease is concerned, arises upon the clause six, it is proper to call attention to clauses fourteen and fifteen, which are incidental to it.

By the fourteenth clause of the lease it was provided that "the party of the second part (the lessees), on the happening of any occurrence that should render the mining of coal unprofitable, without fault or negligence on their part, at the expiration of any year of the term, shall have the right to surrender the lease by giving notice of such surrender to the party of the first part and paying to it all sums of money due up to the time of such surrender;" while by clause fifteen it was provided that "the successors and

assignees of the party of the first part, and heirs . . . and assignees of the parties of the second part, shall be bound by and entitled to the benefit of . . . the covenants, conditions, and arrangements herein contained."

This lease was for the term of twenty-five years, unless otherwise legally terminated.

The second of these leases, to wit, that made to the Cumberland Coal Mining Company, is substantially the same as the one just quoted, with the following exceptions: It is made directly to the Cumberland Coal Mining Company instead of to Renfroe & Company; was to run twenty-one years from the first day of July, 1892; the subject of it was a tract of 1,700 acres, fully described in the lease; it contained a covenant and agreement that the party of the second part. the Cumberland Coal Mining Company, would mine and take from the premises not less than 15,000 tons, or 375,000 bushels of coal during the year 1892, and for every year thereafter during the continuance of the lease not less than 50,000 tons, or 1,250,000 bushels of coal, and that if during the year 1892 they should not have mined and taken from the premises at least fifteen thousand tons, then the party of the second part should pay to the party of the first part, on the twentieth day of January next succeeding the expiration of such year, in cash, as liquidated

22 P—42

rent for said premises during said year, such sum of money as added to the amount of rent or royalty already paid for each year, should be equal to the sum of $2,000; and that for the full term of the lease after the expiration of the year 1892, in case they should not have mined at least 1,250,000 bushels each year, as provided, then the party of the second part should pay to the party of the first part, on the twentieth day of January next succeeding the expiration of such year, in cash, as liquidated rent or royalty for said premises for such year, such sum of money as added to the amount of rent or royalty already paid for such year, as should be equal to the sum of $8,000, etc.

Immediately upon receiving the assignments of these leases the defendant company took possession of the properties covered, and operated them until about July 1, 1894. However, on March 14, 1894, the Tennessee Coal, Iron & Railroad Company addressed a letter to the complainant, in which it was stated that because of "existing conditions of the mine it is impossible for us to conduct operations without losing money," and that the company had "decided to surrender the leases on the tenth of July next," under the authority of that clause in each of the leases providing for a surrender of the same at the close of any year under certain conditions which the letter

stated then existed. On March 16 the complainant replied to this communication, and as this reply bears upon a question arising further along, it is given in full, as follows:

"GENTLEMEN—I have your favor of March 14th, and regret very much to hear of your decision to surrender the Big Mountain leases. You have, however, worked the mines long enough to be able to determine whether or not you can operate them successfully.

"I beg to call your attention, in this connection, that by the clause of the lease under which you surrender the mines it provides that before the final surrender is made that you should pay whatever is due up to that time, which, of course, means the minimum royalty as provided for in the lease.

"When parties leasing from this company have continued their effort to mine coal, we have never enforced the minimum royalty, as provided for in the lease. In case, however, a lessee availed himself of his privilege of surrendering the lease under the clause to which you allude, I think this company should collect the minimum amount as provided for by the lease, and which you doubtless would expect to do. You will readily see the amount you have been paying is not up to the minimum provided for by the lease, and I therefore would be glad to have you make up

a statement of the amount so that I can see if it tallies with our books.

"Very truly yours,

"W. P. Chamberlain, *Treas.*"

On or about the first of July, 1894, the defendant abandoned the property, and the complainant entered. Questions of liability growing out of the occupancy by the defendant being unadjusted, the bill in the present cause was filed to enforce payment of a large balance of $25,890.53, with interest, claimed by the complainant to be due from the defendant as liquidated rent or royalty under these leases during its period of occupancy. This claim is thus stated in a paragraph of the bill: "Complainant further shows to the Court that under the terms of the aforesaid leases, owing to the failure of defendant during the years 1892, 1893, and 1894 to mine a sufficient amount of coal to yield the minimum liquidated rent or royalty stipulated for in said leases, there became due and owing to complainant on January 20, 1894, the sum of $12,438.05, which bears interest from that date, and on July 1, 1894, the date of the abandonment of the leases by defendant, the sum of $6,033.64, which bears interest from that date, making the aggregate principal sum of $25,890.53, with interest on the respective portions thereof from the dates above mentioned. This amount was due and unpaid on July 1, 1894, and owing from defendant to com-

plainant at the time defendant abandoned the said leases as above stated."

There was an original answer, and several amended answers, filed to the bill, in which a number of defenses, some material and others now immaterial to the case, were set up. Those material are that defendant, with reference to all matters growing out of its occupation of the mines, under these leases, had made a full and final settlement with complainant, and had paid to it the amount of funds due on this settlement; that the defendant had expended $60,000 or more in developing these mines, and had discovered that the coal therein was worthless and unmerchantable, and that being so their leases were not supported by any legal consideration, and that no action upon them would lie; that complainant is a corporation of the State of Tennessee, chartered on March 14, 1872, by decree of the Chancery Court of Roane County of this State, under Chapter 54 of the Acts of the Legislature of 1870; that it was incorporated as a manufacturing, quarrying, and mining corporation, with the power "to hold, purchase, dispose of, and convey real and personal estate to the extent prescribed by law, and if not limited by law, such an amount as the business of the corporation requires;" that the corporation exceeded its power in the lease to J. W. Renfroe and others, and that the lease was therefore *ultra vires* and void, as was the transfer of

this lease to the Cumberland Coal Mining Company and its later assignment to the defendant; that this is equally so as to the lease made directly to the Cumberland Coal Mining Company and the assignment of the same to the defendant.

It was further averred by way of defense that though incorporated for the purpose of mining, manufacturing, and quarrying, yet complainant had never engaged in doing either of these things; "that it had utterly failed to discharge any of its corporate functions; that its duties and functions as a mining company had been relegated to and discharged by lessees of its coal lands; that it was a mining and manufacturing company only in name; that its only business in fact had been to lease its coal lands and collect its rents;" and for these reasons the leases in question were *ultra vires.*

The answer also relies on a noncompliance by the complainant in making these leases with Chapter 198 of the Acts of 1887, which is entitled "An Act to empower corporations to lease and dispose of their property and franchises." Section 1 of this Act provides as follows:

"That all corporations now or hereafter existing under the laws of this State, whether incorporated under special or general laws of the State, shall have the power, and they are hereby authorized and empowered, to lease and dispose of their property and franchises, or any part thereof, to

any corporation of this or any other State engaged in or carrying on, or authorized by its charter to carry on in this or any other State, the same general business as is authorized by the charter of such lessor corporation, and said corporations shall likewise have the power, and are hereby authorized to make any contract for the use, enjoyment, and operation of their property and franchises, or any part thereof, with any such other corporation of this or any other State, on such terms and conditions as may be agreed upon between the contracting corporations; and such lessee corporation or corporations is authorized and empowered to make and carry out such leases and contract; provided, however, that any such leases or contract, when made by or under direction of the board of directors of the contracting corporation, shall be authorized or approved by the vote of a majority in amount of the stock of the lessor corporation present or represented at a regular or called meeting of the stockholders of such corporation; and provided further, that sixty days' notice of such meeting be given in a Memphis, Knoxville, and Nashville newspaper of the time, place, and purpose of said meeting; and provided further, that where the lessee corporation is a corporation of this State, the authority or approval of its stockholders shall in like manner be obtained to the contract or lease; and provided further, that this Act shall

not be so construed as to authorize any corporation of this or any other State to lease or purchase any railroad line that is a competitor for the same business, with any line already owned, or under control, by lease or otherwise, or two lines of railway that are competitors for the same business in this State."

It is averred in the answer that the requirements of this proviso were in no particular complied with; that the original lease nor the several assignments thereof were at no time authorized or approved by the "vote of the majority in amount of the stock of the lessor corporation present or represented at a regular or called meeting of the stockholders of such corporation; that sixty days notice of such meeting was at no time published in the newspapers, and that in the case of Cumberland Coal Mining Company this corporation accepted its original lease and transferred this and the Renfroe lease to the defendant without the authority of its stockholders in like manner and without publication calling for a meeting of its stockholders, and that the defendant corporation also failed to obtain the approval and authority of its stockholders to the acceptance of said lease as required by the statute. It is therefore insisted that the making of the original leases was *ultra vires* as to complainant company, and the acceptance of the Cumberland Coal Mining Company of the lease made

Coal Creek, etc., Co. *v.* Tennessee Coal, etc., Co.

to it, and its transfer of this and the Renfroe lease, was *ultra vires,* and the acceptance by the defendant company as assignee of this lease was equally *ultra vires,* so that no legal obligations arise therefrom.

Much evidence was taken by both parties, and upon the hearing of the case the Chancellor decreed that there was a balance due from defendant to the complainant, under the royalty clauses already set out in the lease, aggregating ($23,-784.28) twenty-three thousand seven hundred and eighty-four dollars and twenty-eight cents, to which interest was added, making the total recovery $34,-280.03) thirty-four thousand two hundred and eighty dollars and three cents. From this decree an appeal was taken by the defendant. The Court of Chancery Appeals affirmed this holding, and the case is now before us on an appeal.

The assignments of error to the action of the Court of Chancery Appeals are as follows:

(1) That complainant's charter has expired, and it is therefore no longer a corporation.

(2) That complainant had no authority in law to execute the leases.

(3) That neither complainant or defendant complied with Chapter 198, Acts of 1887, nor did the Cumberland Coal Mining Company, therefore the defendant acquired no title under the assignments made to it.

(4) That the liquidated or stipulated rent or royalty is in fact a forfeiture or penalty.

(5) That inasmuch as complainant treated the leases as null and void on July 1, 1894, when the defendant surrendered, or attempted to surrender them, it cannot now predicate an action thereon, even for the time the defendant was in actual possession of the leased premises.

(6) That the minimum royalty clause in the leases is not enforceable because of failure of consideration.

As to the first assignment of error, as little, if any, stress is laid upon it in argument, it is only necessary to say that the complainant was incorporated by decree of the Chancery Court of Roane County in March, 1872 (*Heck* v. *McEwen*, 12 Lea, 97), and that it had a life of twenty years; that Chapter 197 of the Acts of 1887 authorized the continuance of the existence of all corporations whose charter expired by limitation for the term of five years from the period of such limitation; and that subsequently, but before the dissolution of this corporation, the persons organized as such availed themselves of the privilege granted by Chapter 146 of the Acts of 1893, and conforming in every respect to its provisions, continued the existence of the corporation. There is nothing in the assignment of error, and it is overruled.

2. The next objection urged is that complainant had no right to make the leases in question.

The power to lease, at least so far as private corporations are concerned, is an incident of ownership (Thompson on Corp., Sec. 8365, Vol. 7; Angell & Ames on Corp., Sec. 91; Beach on Corp., Vol. 2, Sec. 263; Morawetz on Corp., Vol. 2, Sec. 1121). But in addition § 1472 of the Code, 1858, gives to all private corporations the power "to hold and purchase, dispose of and carry, real and personal estate to the extent prescribed by law; and if not limited by law, such an amount as the business of the corporation requires." In this power to "dispose of" is included the power to make leases.

The argument of the defendant seems to concede, and if this is not true, it is at least well established, that the complainant, though incorporated to carry on a mining, quarrying, and manufacturing concern, has not done either of these things, and that it is the owner of a very large body of lands which might be utilized by it for either of these corporate purposes, but has not been. These matters cannot be the subjects of judicial determination in this cause. If the corporation has been guilty of neglect or abuse of its corporate privileges in respect to these matters, it is for the State alone to make the question. *Barron* v. *Turnpike Co.,* 9 Hum., 304; Thompson on Corp., Sec. 8358; *Cowel* v. *Colorado*

*Springs Co.*, 100 U. S., 55; *Natima Water & Mining Co.*, 14 Col., 544; *Russell* v. *Texas, etc., Ry.*, 68 Texas, 646.

This being the law, it can therefore make no difference with the defendant, even if it be true, as suggested in the brief of defendant's counsel, that by a failure to compel complainant to employ so much of its capital as may be necessary "in opening mines, constructing tracks, buildings, machinery, structures," etc., it may be enabled "to reach out and monopolize all the coal lands in the State." For the greater the abuse in this regard, the more imminent will be the necessity for, and the greater the probability of the State instituting proceedings for a forfeiture of its charter.

The exact point of the insistence in this regard of the able counsel is thus stated by him in his printed argument: "I do not contend that complainant has no power to execute a lease. On the contrary, I concede that it may execute any lease provided the purpose of executing the same be not to enable the company to carry on its business through the agency of another corporation. To illustrate: Complainant may lawfully make leases of its lands for agricultural purposes, inasmuch as the surface of the lands for agricultural purposes would not impair their use for mining purposes. Complainant may also make leases for the cutting of timber, provided such timber

be not fit for manufacturing purposes. . . . Our only contention is that complainant cannot make any lease the purpose of which is to · enable complainants to carry on its business through other corporations; and that contention is based upon the rule laid down in *Marble Company* v. *Harvey,* which prohibits a corporation from transacting its business through the agency of another corporation."

If this argument be sound, then carried to its legitimate result, if the complainant corporation was engaged by its employees in digging coal or quarrying marble, and there were large deposits of coal or of marble on · its lands, which it could not hope to reach with its own capital and. labor, intelligently and energetically bestowed, it could not lease a foot of its · land to other corporations to develop these minerals, but would be put to the alternative of permitting the land containing this excess of deposits to lie ·idle and be a consequent burden on its resources, or else of selling it. Or if the complainant corporation had a manufacturing plant on a portion of its property which was being operated actively by it, and yet had other eligible but unused sites for such plants, it could not lease these to other parties. Or if it had bodies of timber on its lands, far in excess of its own requirement, it could not lease an acre of this timber, if the

timber so leased was fit for manufacturing purposes.

It is true the statement of the proposition is limited to leases made to other corporations, but is it sound, when it leads to such results, however limited?

The contention is rested largely, though not altogether, as is seen in the paragraph from counsel's brief set out above, upon *Marble Company* v. *Harvey,* reported in 92 Tenn., 115. We do not think that case supports this contention. The gist of that case, and the Court's opinion in determining it, is found in the first of the syllabi, which is as follows: "A corporation cannot lawfully become the owner of shares in any other corporation unless by power specially granted by its charter or necessarily implied in it. The unauthorized purchase by a corporation of the shares of another corporation is *ultra vires* and void. No suit can be maintained by either party in furtherance or affirmance of such void contract, not even by a party who has fully executed the contract on his own part. Such illegal contract creates no estoppel upon either party."

That was a case where an Ohio corporation had purchased all the shares of stock of a Tennessee corporation engaged in a similar business and under a similar charter, and the controversy arose from the purchase of the last of the shares. The principle announced is limited to the facts

of the case, which bear no analogy to those of the present.

The pith of the present contention is in the statement that "a corporation must carry on its business by its own agents, and not through the agency of another corporation." This statement forms a part of a paragraph taken from the text of Mr. Morawetz, Section 431, embraced approvingly in the marble company case opinion. The entire paragraph is as follows:

"A corporation has no implied right to purchase shares in another company for the purpose of controlling its management, nor may a corporation hold shares in another company as an investment, unless this be the usual method of carrying on its own proper business. A corporation must carry on its business by its own agents, and not through the agency of another corporation. It is clear also that a corporation has no implied right to speculate in shares unless this be the kind of business for which the company was formed."

It will be seen that the author is dealing with the purchase by one corporation of shares in another company, either for the purpose of controlling its management or as an investment, or with the view to speculate, and the sentence relied on here is to be limited to these matters. This is further apparent, when the cases are examined cited by the author in support of his text, to

wit: *Mutual Savings Bank* v. *Meriden Agency Co.,* 24 Conn., 160; *Franklin Co.* v. *Lewiston Inst. for Savings,* 68 Me., 43; *Sumner* v. *Maury,* 3 Wood N. & M., 105; *Berry* v. *Yates,* 24 Barb., 199. These cases all involve and deny the power of one corporation to subscribe for or purchase shares of stock in another company, or to advance its capital to sustain the business of this other company.

It is also insisted that *Mallory* v. *Oil Works,* 86 Tenn., 604, supports this contention. We do not think so. In that case a number of oil companies formed a combination or syndicate and turned over their properties to an executive committee or management, upon terms which the Court held made a partnership unlawful in its character, and which either party could repudiate.

But after all, however stated, we agree with the Court of Chancery Appeals that "the contention goes back to the point that complainant is neglecting to use its franchises, as to running, manufacturing, and quarrying," and so neglecting could not make these leases. This is, however, a matter for the State, and not the defendant.

3. It is true that neither complainant nor the defendant complied with Chapter 198, Acts of 1887, and the question is, Does this failure make the contract of leasing void? Conceding for the moment that this Act applies to all corporations organized for profit, whether they be private or

*quasi* public, is it true that every lease or sale made by such corporation to another similar corporation must conform to the requirements of this Act, under the penalty, if otherwise, of having the lease or sale avoided by the Courts? Is it true that if a railroad company finds that it has real estate or engines or cars or other property not needed for carrying on its operations, and which are needed by another railroad company, that no valid contract of lease or sale of these properties can be made, until the contract has been approved by a majority of the stockholders of the two corporations at meetings convened, after sixty days notice, in newspapers published in Memphis, Knoxville, and Nashville? Or is it true that a private corporation, such as a bank, owning real estate beyond its needs, cannot lease or sell such realty to another private corporation which does require it, without conforming to these same provisions? Could the Legislature have intended thus to hamper the ordinary transactions of such corporations? If the present argument is sound, this must be so, for the phrasing of the Act is that "they are hereby . . . empowered to lease and dispose of their property, franchises, or any part thereof to any corporation," etc., thus embracing the smallest and most insignificant of such transactions as well as the most important.

We do not think such a purpose was in the

22 P—43

mind of the Legislature, and that a construction leading to such a result would be intolerable. On the contrary, we are satisfied that the intention of this Act was to regulate such, and only such, leases and sales of corporate property and franchises as were essential to corporate integrity and to the exercise of the duties and functions imposed by the terms of the company charter. A sale or lease involving those interests which are coextensive with corporate life it may well be said this Act regulates, but a sale or lease of property which does not to the slightest extent cripple or interfere with the proper discharge of the duties imposed by the charter of the company is not embraced within its intent.

If this be the right interpretation of the Act, even with the concession that a private corporation is embraced by it, then these leases cannot fall within it. For the record discloses that the complainant owns seventy-five thousand acres of mineral lands, of which these leases cover only twenty-eight hundred acres, while all the other leases given out by the company embrace only about sixteen thousand acres, leaving thus three-fourths of its holdings subject to its absolute control.

But we are satisfied that this legislation was never intended to embrace private corporations as contradistinguished from *quasi* public corporations. This is an enabling Act, and such a corporation

did not require it; they have always had the power to sell all or any part of their property at their will. *Parker* v. *Bethel Hotel Co.,* 96 Tenn., 252; *Frazier* v. *Railroad,* 88 Tenn., 153; *Commonwealth* v. *Smith,* 10 Allen, 448; *De Camp* v. *Alward,* 52 Ind., 468; *Kansas City H. Co.* v. *Taner,* 65 Mo., 279.

At common law, the right of a corporation, acting by a majority of its stockholders, to sell its property was absolute, and was not limited as to objects, circumstances or quality. 2 Kent, 280; *Mayor* v. *Lawton,* 1 Vesey & B., 226; *Dinney's Case,* 2 Bland, 142; 4 Thompson Corp., §§ 5374, 5358.

And this common law right is as inherent in a quasi-public corporation, within well-defined limits, as in a mere private corporation. As was said by Mr. Justice Bradley, in *Branch* v. *Jessup,* 106 U. S., 468: "Outlying lands not needed for railroad uses may be sold. Machinery and other personal property may be sold." But when it comes to the disposition by mortgage, sale or lease of its franchises or of corporate property essential to its operation as a quasi-public corporation, then there is an exception to this right of alienation. This power of alienation by such a corporation, "by the great weight of authority, must be expressly conferred." *Frazier* v. *Railway Co.,* 88 Tenn., 138.

The reason for this exception to the general

rule, as has been often announced by the courts, is that their franchises are granted in consideration that they will discharge those duties imposed by charter and in which the public is interested. So the law makes void every effort made by such corporation to deprive itself by alienation of its property necessary to the faithful discharge of these duties. It cannot relieve itself even by a vote of all of its stockholders of its duties by any mode of alienation. Every such effort is discountenanced by the Courts. *Frazier* v. *Railway Co.,* 88 Tenn., 138; *Thomas* v. *West Jersey Railroad Co.,* 101 U. S., 71; *Branch* v. *Jessup, supra; Central Trans. Co.* v. *Pullman Car Co.,* 139 U. S., 24.

Such a corporation, therefore, needed the aid of this statute. But it was "not so with corporations of a private character established solely for trading and manufacturing purposes. Neither the public nor the Legislature has any direct interest in their business or its management. These are committed solely to the stockholders, who have a pecuniary stake in the proper conduct of their affairs. By accepting a charter they do not undertake to carry on the business for which they are incorporated indefinitely and without any regard to the condition of their corporate property." *Treadwell* v. *Salisbury Mfg. Co.,* 7 Gray, 393; *Ardisco Oil Co,* v. *Oil Co.,* 66 Pa. St., 375.

In view of these considerations, we think it

clear, while the Act in question by its terms applies to "all corporations now or hereafter existing under the laws of the State," that under a well-settled rule of construction it will be limited to such corporations as required an enabling statute to do those things contemplated therein. This rule is thus stated by Mr. Sutherland: "When the subject-matter (of a statute) is once clearly ascertained, and its general intent, . . . . general words may be restrained to it, and those of narrower import be expanded to embrace and effectuate that intent. When the intention can be collected from the statute, words may be modified, altered or supplied so as to obviate repugnancy or inconsistency with such intention." Sutherland on Statutory Construction, Sec. 218. This objection is therefore overruled.

4. It is earnestly insisted that the Court of Chancery Appeals was in error in holding the clauses in the lease contracts providing for a minimum rent or royalty were agreements to pay liquidated rent or royalty.

In making a contract parties are at liberty to leave open the question of damages for breaches thereof to the determination of the Courts, or else they may fix these damages in the contract itself. The confusion in the cases arises from the disposition of the Courts to relieve parties to contracts from what seem to be improvident bargains, by converting provisions which would naturally im-

port an undertaking to pay a fixed amount for a breach into a penalty intended simply to coerce the obligor into the performance of his contractual duty. While this is true, yet it is generally affirmed by the Courts that "when the damages are in their nature indefinite and uncertain, and the parties have mentioned a specific sum of liquidated damages, it will be so regarded unless it be greatly disproportioned to any probable estimate of damages." 1 Beach on Contracts, Sec. 624; *Railroad* v. *Cabinet Co.,* 104 Tenn., 568.

It would seem that in a mining contract this latter rule would especially apply. The value of the lessor's coal imbedded in the earth as an income-producing property depends upon the amount of it which is excavated by the labor of the lessees. If much is thus produced the results for the lessor will be favorable; if little, then they will be correspondingly less. It is impossible for the lessor antecedently to determine how well the lessee will discharge his obligation, whether he will be slothful or diligent, and thus he is unable to calculate, either accurately or with approximation, what his money loss will be if the lessee is negligent in performing or wholly disregards his contract. Such a contract, it would appear, would be an eminently proper one for a stipulation providing liquidated rent or royalty for a breach. An examination of the authorities indicates that this

is the view generally, if not uniformly, taken when this exact question has arisen.

In the new work of Barringer & Adams, of the Philadelphia bar, on the "Law of Mines and Mining," p. 108, it is said: "If the lessee sees fit to covenant to mine a certain amount, he will, as a general thing, be held to strict performance, or in case the ore is not taken out he will be held liable for the payment of rent and royalty the same as if it had been taken out—this being regarded as equivalent to stipulated damages, which may not be reduced by evidence of the actual value of the mineral, and this whether or not there is an expressed covenant to pay a royalty on a minimum amount."

In *Lehigh Zinc & Iron Company* v. *Bamford*, 150 U. S., 655, there was a mining lease providing for the payment by the lessee of a royalty of one dollar and fifty cents per ton on all concentrated ore mined from or used on the premises, with an additional provision that "in case the royalty due . . . to the parties of the first part according to the above rates shall in any year fall below the sum of $1,000, then the party of the second part shall pay to the parties of the first part such additional sum of money as shall make the royalty of such year amount to the sum of $1,000, which sum shall be held and taken as the royalty of that year." The suit was for a breach of this covenant for

three years in succession, and a recovery was had for $3,201.58. The Supreme Court, speaking through Mr. Justice Harlan, said: "Looking at all the provisions of the lease, it is clear that the defendant engaged to pay as rent, in each year, the royalties fixed in the lease; and if in any year the royalties fell below the sum of one thousand dollars, it was to make up the deficit so that the latter sum should, in any event, be paid annually as rent." The Court so holding affirmed the judgment.

In *Flynn* v. *Coal Co.,* 72 Iowa, 738, a lease of coal land provided that the lessee should pay a certain royalty on coal taken out, and also provided that a certain amount should be taken out, and it was held that the lessee was bound to pay royalty on the amount agreed to be taken out, whether actually taken out or not, and that, too, although a portion of the term was necessarily occupied in making preparations to begin mining.

In *Gilmore* v. *Ontario Iron Co.,* 86 N. Y., 455, the plaintiff leased certain land to the defendant for him to mine and move the iron ore therefrom. Among other things, the lessee agreed to pay twenty cents a ton for all ore and to mine eight thousand tons annually. It was held, in an action to recover for a breach of this agreement, that the lessee, upon his failure to exercise an option given him by the contract, was

bound to pay at least sixteen hundred dollars annually.

In *McIntyre* v. *McIntyre Coal Co.,* 105 N. Y., 264, under dissimilar conditions, but such as required the consideration of a royalty clause in the lease of coal lands, it was recognized as a fixed and enforceable stipulation according to its terms.

The case of the *Consolidated Coal Co.* v. *Prees,* 150 Ill., 344, involved, among other questions, one as to a minimum royalty provision in a coal mining contract. As to this the Court said:

"We understand the rule to be that if, from the nature of the contract, damages cannot be calculated with any degree of certainty, or from the peculiar circumstances contemplated by the contract, the stipulated sum will be held to be liquidated damages. . . . We think that the rule last above stated is applicable to the case at bar. . . . Besides this, the clause in question was, under the circumstances of the case, an eminently reasonable one. Without it the effect of the contract would have been to divest appellee of all control over the coal under their land for the long period of twenty-five years, and would have left them without any power to compel the lessee or its assigns to take out a bushel of it. The lessee was a coal mining company and must be presumed to have been well informed in respect to the subject matter in regard to which it was contracting. It is manifest from the terms of the lease, as there

set forth in the declaration, that the parties be-
lieved that the royalties would exceed, instead of
fall below, $1,200 per year. This is obvious from
the fact that said sum is fixed as a minimum
royalty to be paid."

In *Powell* v. *Burroughs,* 54 Pa. St., 329, with
regard to the uncertainty attending a mining ven-
ture and the reasonableness of fixing a min-
imum royalty, the Court said: "The defendant
covenanted to take out of the Burroughs mine
leased in 1862, without any reference to any oth-
er mine or lease, so many tons per year while
the term lasted; and on a failure to take them
out to pay for the stipulated number taken or
not taken. . . . It was therefore a clear case of
stipulated damages in case of non-performance *pro
tanto.* The parties fixed it as the true measure
of damages in case of failure . . . and . . . were
bound by it. The uncertainty as to the extent of
the injury which may ensue is a criterion by
which to determine whether it is a case of liqui-
dated damages or penalty."

See also *Central Appalachian Co. Limited* v.
*Buchanan,* 73 Fed. Rep., 1006; *Lehigh & Wilkes-
barre Coal Co.* v. *Wright,* 177 Pa., 387; *Clark*
v. *Midland Blast Furnace,* 21 Mo. App., 58.

The question of reasonableness or unreasonable-
ness must be determined from the situation of the
parties at the time the contract was made, and
the nature of the business itself. On these points

the Court of Chancery Appeals find the following facts: "The testimony shows that the mine in question had been worked for a considerable time by Renfroe & Company and by the Cumberland Coal Mining Company. Also that before the lease was taken the defendant sent an expert to examine the mine. Both sides, therefore, knew the capabilities of the mine. The fact that a minimum amount was contracted for indicates that, in view of all of the circumstances then known to both parties, it was supposed that at least that much could be taken from the mine. Both parties were in possession of the facts known by which the reasonableness of the contract could be determined —that is, as to the nature and character of the mine and the quality of the coal and the probable output. Those circumstances were that the mine had been opened and worked as stated, and there appeared to be · a ́ sufficient quantity of coal and of a fairly salable quality. Under these circumstances it was not unreasonable that· the parties should contract for a minimum amount to be mined, nor was the minimum fixed at a very large amount. The testimony shows several mines worked by the defendant where the output is greater than the minimum amount contracted for. There is one other element that should be considered in connection with the question of reasonableness, and that is the uncertainty that attended the matter from the complainant's standpoint as to

how the defendant would in fact conduct its mining operations, and whether it would or would not exercise diligence in taking the coal from the mine. Another point to be considered in this connection is the fact that the complainant had put the defendant in possession of its mines for a long series of years, and had thereby placed the control of the mines out of its own power."

But it is insisted that there was a contemporaneous construction of these royalty clauses by the parties, showing that the sum stipulated was regarded as a penalty, rather than as liquidated damages. As to this the Court of Chancery Appeals finds the facts to be as follows:

"Taking up the matter at the time when the defendant became interested, the first installment of liquidated rent, or royalty, was due on the 20th of January, 1893, for the previous year, and on the 20th of January, 1894, for the year 1893. The proof shows that the lessees, at the end of each quarter, reported to the lessor the number of tons of coal actually mined during that quarter, and the lessor made out accounts against the lessees for the sums due to lessor for the coal so reported to have been mined during that quarter. The lessor itself, therefore, has made at least sixteen quarterly accounts for rent due under said leases, and in no one of said accounts did the lessor claim any rent, except the price per ton for coal actually mined; that is to say, in claim-

ing payments for the amounts actually mined, nothing was at the time said about the coal not mined. The treasurer of the lessor never presented to defendant any demand for minimum royalty until after the defendant surrendered the leases in controversy in this suit. This demand appears in the letter which we have copied *supra,* and which letter was in reply to the notice of surrender which the defendants gave to the complainant."

In *Powell* v. *Burroughs, supra,* it appears the trial Judge declined to charge that a settlement for the rent of the past year, without exacting rent for coal not mined, according to the terms of the lease, was a discharge from liability on the covenant to mine a certain number of tons per annum, or, on failure to mine so much, to pay the rent as if mined. Upon an assignment of error to this refusal the Supreme Court said: "'The learned Judge refused to respond as requested, and we agree he was entirely right in doing so. It was quite too much to affirm, as a conclusion of law, that payment for coal taken out was a discharge of all liability for a breach of the contract to take out a defined number of tons. The covenant to pay rent for the coal mined and taken away was distinct from the covenant to mine a certain number of tons. Receiving a stipulated sum for one was not necessarily a release of the other."

We think it equally too much to affirm as a

presumption of fact in the present case that by a failure on the . part of lessor to demand, either upon quarterly or annual settlements for the coal mined, a payment of that not mined up to the minimum, that thereby it waived its right to make such demand at its pleasure. Certainly in this form of settlement there was nothing to equitably estop complainant from making such future demand. In addition, the language of the clause in question is clear. There is no ambiguity in it. It admits, we think, of but one construction. Its effect was to confer a fixed legal right on the lessor and to impose a corresponding legal obligation upon the lessee. In the face of a clause so clear as this one in question, what is said in *Giles* v. *Camstock* (N. Y.), 53 Am. Dec., 374, is pertinent:

"The force of this contract of the lessee to pay in advance is sought to be avoided by the previous practice of the parties; which, as it appears by the testimony, was not in accordance with the terms of the lease; but the rent had before, in fact, been paid at the end of each quarter, and, of course, after it had accrued by occupation of the premises. But I apprehend the authorities relied upon do not reach the case before us. In *French* v. *Carhart*, 1 N. Y., 96, certain often recognized rules of construction were quoted and approved by His Honor, Judge Jewett, and among the rest, that when the words of grant are

ambiguous, the Court will call in the aid of the acts done under it, as a clew to the intention of the parties. But the terms of this lease are not at all ambiguous; there is no doubt about their meaning, and it would be adopting an entire new rule to affirm that the specified time of payment of money is not, according to the intention of the parties, whenever the creditor shall not demand, or the debtor shall neglect to pay until some time after payment due. There is here no room for the operation of any rule of construction which arises out of doubtful or ambiguous terms of a written contract." This assignment is overruled.

5. The fifth objection is founded upon a misconception of a single phrase in complainant's bill, and is not warranted by the facts found in the case. There was no forfeiture on the part of the complainant, but a surrender of the lease by the defendant under a clause therein, which authorized it, and an acceptance of this surrender. Without elaborating this further, we are content to overrule this objection.

6. The sixth objection is that the coal in the property leased was unmerchantable, and that being so there was such a failure of consideration as to make the minimum royalty clauses unenforceable.

"While non-existence or exhaustion of coal may . . . relieve a lessee from the covenants of his lease, unmerchantability in the absence of special

Coal Creek, etc., Co. *v.* Tennessee Coal, etc., Co.

contract, mistake or fraud never does." This is stated to be the rule of law in Section 60 in the works of Barringer & Adams in their work already referred to. Certainly there is much force in the statement, and it is well supported by authority. But it is unnecessary for us to determine whether it is sound or unsound, as the Court of Chancery Appeals find as a fact that the coal in these lands, while inferior in quality, was not unmerchantable. This finding is conclusive on this point. The sixth assignment of error is overruled.

Other incidental questions have been discussed. The points pressed upon us have had that consideration which the importance · of the controversy required, but after a careful consideration we find no error in the record, and the decree of the Court of Chancery Appeals is affirmed.